### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| CARLOS HERNANDEZ, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No.  2:15-cv-00993-KOB-SGC |
| | ) | |
| WARDEN CHERYL PRICE, et al., | ) | |
| | ) | |
| Respondents. | ) | |

### MEMORANDUM OPINION

This is a *pro se* petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by Carlos Hernandez, a state prisoner.  Hernandez challenges his state conviction for cocaine trafficking.  For the following reasons, Hernandez's claims are due to be dismissed, either as unexhausted or meritless.

## I.    BACKGROUND

On June 22, 2012, a jury sitting in Jefferson County, Alabama, convicted Hernandez of cocaine trafficking.  On July 26, 2012, the trial judge sentenced Hernandez to life without parole. (Doc. 17-1 at 33, 38-39).[1]  Hernandez filed a direct appeal, raising five issues:

1. whether the evidence was sufficient to prove the element of knowledge, including knowing possession and knowledge of the charged amount of cocaine;

2. whether the indictment should have been dismissed, or whether in the alternative there should be a new trial, based on the failure to inform the defense of the identity of the most material potential witness and based on the government's failure to provide information allowing the defense to compel that person's appearance at trial;

3. whether the trial court erred in denying a motion to suppress;

---

[1] Citations to the record in the instant case refer to the document and page numbers assigned by the court's CM/ECF filing system and appear in the following format: (Doc. __ at __).  Citations to the state court records are preceded by the applicable case name and number and refer to the document numbers assigned by the Alacourt filing system.

4. whether the trial court erred by refusing to instruct the jury that merely acting in conformity with another's criminal conduct is insufficient to establish guilt; and

5. whether the trial court erred in concluding that it had no discretion regarding the sentence.

(Doc. 17-14 at 14).

The appellate court affirmed Hernandez's conviction by memorandum opinion on April 26, 2013. (Doc. 12-1). Hernandez sought further review, raising all but the jury instruction claim in a petition for writ of *certiorari*. (Doc. 17-16 at 5-11). The Alabama Supreme Court denied the writ without opinion on September 27, 2013, and entered a certificate of judgment. (Doc. 12-2); *Ex parte Carlos Hernandez*, No. 1120958, 141 So. 3d 1029 (Ala. 2013) (Moore, C.J. dissenting).

On September 19, 2014, Hernandez filed a petition for relief from conviction or sentence pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. (Docs. 17-17); *Carlos Hernandez v. State of Alabama*, CC 2010-000904.60.[2] This Rule 32 petition asserted four claims for ineffective assistance of counsel: (1) trial counsel failed to file a motion to suppress the audio recording of a drug transaction; (2) trial counsel erred by failing to challenge the chain of custody of the cocaine and stipulating to the admission of the Certificate of Analysis; (3) appellate counsel did not challenge the State's failure to provide sufficient notice of its intent to

---

[2] On September 19, 2014, Hernandez filed an application to proceed *in forma pauperis* ("IFP") in the trial court, requesting indigent status in the Rule 32 proceedings. (Doc. 17-19 at 12-14). Hernandez's prison account statements reveal that, during the year preceding the Rule 32 petition he (1) received deposits totaling $2,252.00; (2) had average monthly deposits of $187.66; and (3) had an average monthly account balance of $49.98. (*Id*. at 14). On the day he signed the application, Hernandez had $443.77 in his prisoner account. (*Id*. at 13). The trial court denied his application, and on October 17, 2014, Hernandez paid the $206.00 filing fee. (Doc. 17-17 at 5, 12).

introduce a Certificate of Analysis identifying the cocaine at issue in lieu of live testimony by the forensic scientist who performed the analysis, as required by Alabama law; and (4) trial counsel erred by stipulating to admitting the Certificate of Analysis into evidence, depriving Hernandez of his right to confront the forensic scientist. (Doc. 17-17 at 23-32). The State filed a motion to dismiss the petition on January 12, 2015, arguing Hernandez's claims were meritless and barred under Rule 32. (Doc. 17-19 at 16-20). On January 16, 2015, the trial court denied the Rule 32 petition as insufficiently pled. (Doc. 17-17 at 7-8).

Hernandez appealed the denial of the Rule 32 petition on February 17, 2015, and moved for IFP on appeal. (Doc. 17-17 at 3, 9-11). The trial court and Court of Criminal Appeals denied Hernandez's IFP motions, and after Hernandez failed to pay the $200 docket fee or show good cause for the failure, the appellate court dismissed the appeal and issued a Certificate of Judgment on May 29, 2015. (Doc. 17-20); *Carlos Hernandez v. State of Alabama*, CR-14-0660 (Ala. Crim. App. 2015); *see also Hernandez*, CC-2010-904.60, Docs. 20, 25,[3] 26, 28, 30, 33, 34; (Doc. 14 at 2, 20-26).

Hernandez declares he "could not pay the filing fee to appeal the judgment" and sought mandamus relief, requesting the Alabama Supreme Court to require the appellate court to grant IFP on appeal. (Doc. 20 at 2). Hernandez provides no other details regarding the proceedings

---

[3] According to Hernandez's prisoner account statements, he received deposits totaling $2,180.00 during the 12 months preceding February 28, 2015, maintaining average monthly deposits of $181.66 and an average monthly account balance of $206.78. *Hernandez*, CC-2010-904.60 at Doc. 25. On March 2, 2015, the day he signed his application to proceed IFP on appeal, Hernandez had $142.50 in his prisoner account. *Id.*

other than to declare the Alabama Supreme Court denied the mandamus petition. (*Id.*).[4] Thus, it appears the Alabama Supreme Court refused to issue an order directing the Alabama Court of Criminal Appeals to grant his motion to proceed IFP on appeal. Hernandez did not file an application for rehearing and did not seek *certiorari* from the Alabama Supreme Court. Accordingly, Hernandez never presented the claims presented in his first Rule 32 petition to the Alabama Supreme Court.

In April 2015, while the appeal of the denial of his first Rule 32 petition was pending with the Court of Criminal Appeals, Hernandez attempted to file a second Rule 32 petition with the trial court. (*See* Doc. 17-21 at 3).[5] The second Rule 32 petition presented only a double jeopardy claim under the Fifth Amendment. (*Id.*). The Jefferson County Clerk refused to file the petition and on May 15, 2015, notified Hernandez he could not file a new Rule 32 petition while his first petition was on appeal. (*Id.*); *see also*, *Hernandez*, CC-2010-904.60, Doc. 32. After the Court of Criminal Appeals issued the Certificate of Judgment on his first Rule 32 petition—and after initiating the instant federal habeas petition—Hernandez continued to pursue the filing of his second Rule 32 petition. Although he had to file two mandamus petitions, Hernandez ultimately was successful in his attempts to file the second Rule 32 petition. As explained below, initially the record was unclear whether the second Rule 32 petition revived

---

[4] Respondents do not address this mandamus petition, and neither party has provided any documentary evidence concerning the petition. Neither the mandamus petition nor a ruling on it is available via Alacourt.

[5] The undersigned takes judicial notice of the state court record. *See Coney v. Smith*, 738 F.2d 1199, 1200 (11th Cir. 1984); FED. R. EVID. 201(b)(2); *Keith v. DeKalb Cty., Ga.*, 749 F.3d 1034, 1041 n.18 (11th Cir. 2014). The court record shows Hernandez signed the proposed second Rule 32 petition on April 25, 2015. *Hernandez*, CC-2010-904.00, Doc. 150.

claims from the first Rule 32 petition. This lack of clarity was exacerbated by the haphazard filing of pleadings and orders related to the second Rule 32 petition; these filings and entries appear intermittently in the records of the underlying criminal case,[6] the first Rule 32 petition, and the second Rule 32 petition.

Around the same time, the trial court appointed counsel to represent Hernandez in his first Rule 32 petition and ordered the state to respond. *Hernandez*, CC-2010-904.60, Doc. 41. The court also set the first Rule 32 petition for a hearing. *Id.* at Doc. 45. In the record of his first Rule 32 petition, Hernandez filed a *pro se* motion to consolidate his first and second Rule 32 petitions or alternatively, to amend his second Rule 32 petition to include the claims raised in the first petition. *Hernandez*, CC-2010-904.60, Doc. 47. The State filed a response to the motion in the records of the first and second Rule 32 petitions on February 20, 2018. (Doc. 17-24).

On May 8, 2018, Hernandez filed a reply which was docketed in the record for the second Rule 32 petition; in the pleading—styled as a motion to dismiss—Hernandez abandoned his attempts to consolidate or amend his Rule 32 petitions. (Doc. 19 at 9-11); *Hernandez*, CC-2010-904.61, Doc. 7 (same). The reply conceded the trial court lacked jurisdiction to consolidate because the first Rule 32 petition had been long dismissed and because the trial court could not grant IFP on appeal. (*See* Doc. 19 at 9). The reply also reflected the double jeopardy claim was Hernandez's only pending Rule 32 claim. (*Id.* at 10).

---

[6] *See, e.g., Hernandez*, CC-2010-904.00, Doc. 152 (Hernandez's October 3, 2017 application to proceed IFP), Doc. 153 (Trial Court's October 5, 2017 Initial Order appointing counsel and setting a hearing), Doc. 159 (trial and appellate counsel's notice of conflict regarding hearing in second Rule 32 petition); *Hernandez*, CC-2010-904.60, Doc. 39 (State's October 24, 2017 Motion to dismiss the second Rule 32 Petition); *Hernandez*, CC-2010-904.61, Doc. 3. On December 4, 2017, the Jefferson County Clerk created a court record for Hernandez's second Rule 32 petition. (*See* Doc. 17-23).

On May 15, 2018, the trial court granted Hernandez's motion to dismiss and granted—without clarification—the state's motion to dismiss the first Rule 32 petition. *Hernandez*, CC-2010-904.60, Doc. 57. The court also granted—again without clarification—Hernandez's motion to consolidate and or amend his Rule 32 petition. (Doc. 20 at 5-7); *Hernandez*, CC-2010-904.60, Doc. 59. Hernandez filed no further motions in, or otherwise challenged the May 15, 2018, dismissal of his first Rule 32 petition. No further orders have been entered in the record of the second Rule 32 petition, which remains pending.

On this state court record, the undersigned has the following understanding of Hernandez's post-conviction state court claims: (1) the first Rule 32 petition's claims for ineffective assistance of counsel were dismissed; (2) the second Rule 32 petition's double jeopardy claim remains pending in the trial court. None of Hernandez's Rule 32 claims have been presented to the Alabama Supreme Court.

While Hernandez was pursuing his second Rule 32 petition, he filed the instant petition seeking federal habeas relief in this court on June 10, 2015. (Doc. 1 at 32).[7] After this court denied Hernandez's application to proceed IFP, he paid the $5.00 filing fee. (Docs. 2[8], 3).

---

[7] The Clerk docketed the petition on June 15, 2015, the day the Clerk's office received it. However, "[a] *pro se* petitioner's collateral action is deemed filed in federal court on the date it is delivered to prison authorities for mailing, and absent state-presented evidence to the contrary, we will presume that the petition was delivered on the date the petition was signed." *McCloud v. Hooks*, 560 F.3d at 1223, 1227 (11th Cir. 2009). Hernandez executed his § 2254 petition on June 10, 2015. (Doc. 1 at 32). Accordingly, the petition is deemed filed on that date.

[8] According to Hernandez's prisoner account statements, he received deposits totaling $2380.00 during the 12 months preceding June 2, 2015, maintaining average monthly deposits of $198.33 and an average monthly account balance of $275.46. (Doc. 2 at 3). On June 2, 2015, the day he signed his application to proceed IFP, Hernandez had $116.05 in his prisoner account. (*Id*. at 2). The undersigned notes that Hernandez received deposits of $400 in March 2015, $200.00 in April 2015, and $0.00 in May 2015. (*Id*. at 3). Hernandez's average account balances for each

The instant petition raises the following claims: (1) the trial court erred by refusing to acquit him when the evidence was insufficient to prove the element of knowledge, including knowing possession and knowledge of the charged amount of cocaine; (2) the trial court erred in refusing to compel the state to produce confidential informant Mr. X as a witness, and erred by failing to at least compel the state to provide information to allow the defense to find him;  (3) the trial court erred in refusing to instruct the jury that merely acting in conformity with another's criminal conduct is insufficient to establish guilt; (4) the trial court erred in concluding it had no discretion regarding the sentence;  (5) ineffective assistance of counsel for failure to file a motion to suppress the audio recording of an alleged drug transaction; (6) ineffective assistance of trial counsel for stipulating to the admission of an unsworn Certificate of Analysis in lieu of testimony regarding the chain of custody and the validity of the forensic analysis and conclusions; (7) ineffective assistance of counsel for failure to object to the state's failure to provide the notice required in order to utilize the Certificate of Analysis in lieu of testimony; and (8) ineffective assistance of  counsel for failing to object and preserve for review his right to confront and cross-examine Danny Kirkpatrick, the forensic scientist responsible for testing the alleged cocaine.  (Doc. 1 at 8-30).  The first four claims in the instant petition are substantially the same as claims presented on direct appeal;[9] claims five through eight are substantially similar to claims presented in the first Rule 32 petition.

---

of those months, respectively, were $337.74, $420.23, and $256.96.  (*Id.*).  Thus, Hernandez had the funds to pay the $200.00 filing fee to pursue the appeal from his first Rule 32 petition before the Alabama Court of Criminal Appeals but chose not to do so.

[9] As previously noted, Hernandez's *certiorari* petition on direct appeal did not include the jury instruction claim.

In response to the court's second order to show cause,[10] Respondents argued for dismissal and denial of the petition for lack of exhaustion due to Hernandez's pending post-conviction collateral attacks in state court. (Doc. 17 at 3-4). The response also asserted that Hernandez was not entitled to habeas relief on the claims he exhausted on direct appeal.

## II.    DISCUSSION

The instant petition asserts three claims that were presented to the Alabama Supreme Court on direct appeal; the remainder of the claims were not presented to the Alabama Supreme Court, either on direct appeal or via a post-conviction remedy. Because Hernandez never presented his claim regarding the jury instruction (Claim 3) or his claims for ineffective assistance of counsel (Claims 5-8) to the Alabama Supreme Court, these claims are due to be dismissed as unexhausted. The remaining claims are due to be denied on the merits. Each conclusion is addressed in turn.

### A.    Unexhausted Claims Regarding Jury Charge and Ineffective Assistance

A state prisoner is generally ineligible for federal habeas relief unless he has first exhausted the remedies available in the courts of the state of conviction. *See* 28 U.S.C. § 2254(b)(1)(A); *Kelley v. Secretary for Dept. of Corr.*, 377 F.3d 1317, 1343-44 (11th Cir. 2004). A state prisoner must first present any federal constitutional or statutory claim through one complete round of the state's trial and appellate review process, either on direct appeal or in state post-conviction proceedings. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Mauk v. Lanier*, 484 F.3d 1352, 1357 (11th Cir. 2007). Thus, an Alabama state prisoner must attempt to present

---

[10] The court entered the first order to show cause on December 15, 2015. (Doc. 11). In response, Respondents contended Hernandez's claims were unexhausted because of the then-pending October 12, 2015, mandamus petition. (Doc. 12).

each of his claims to the Alabama Supreme Court. *Pruitt v. Jones*, 348 F.3d 1355, 1359 (11th Cir. 2003); *Smith v. Jones*, 256 F.3d 1135, 1140-41 (11th Cir. 2001). Where a claim has not been exhausted in the state courts and the time in which to present the claim there has expired, the claim is deemed procedurally defaulted, and review in the federal courts is generally precluded. *See Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *McNair v. Campbell*, 416 F.3d 1291, 1305 (11th Cir. 2005).

Here, Hernandez's federal habeas claims for ineffective assistance of counsel were presented to the sentencing court in his first Rule 32 petition. But Hernandez did not pursue his appeal regarding the first Rule 32 petition to the Alabama Supreme Court. Instead, the Court of Criminal Appeals denied his motion seeking IFP on appeal.[11] While Hernandez unsuccessfully sought mandamus relief regarding the denial of IFP on appeal, he never actually presented to the Alabama Supreme Court the substantive claims included in the first Rule 32 petition. Accordingly, Hernandez has not exhausted state court remedies regarding his federal habeas claims alleging ineffective assistance of counsel.[12]

Additionally, while Hernandez initially raised the jury instruction claim on direct appeal, he did not present it to the Alabama Supreme Court in his petition for writ of *certiorari*. So he also failed to exhaust his state court remedies as to the jury instruction claim.

---

[11] As noted previously, the record in the instant matter reveals Hernandez had the funds to pay the fee to appeal the first Rule 32 petition but chose not to pay. *See* note 8, *supra*.

[12] In light of Hernandez's subsequent abandonment of his attempt to incorporate his ineffective assistance claims into his pending second Rule 32 petition, these claims now appear to be procedurally defaulted.

For the foregoing reasons, the claims asserting ineffective assistance of counsel (Claims 5-8) and challenging the sentencing court's jury charge (Claim 3) are due to be dismissed as unexhausted.

**B**.     **Remaining Claims are Without Merit**

As noted previously, Hernandez's remaining claims were exhausted on direct appeal. (Doc. 17 at 3-4).  Where a claim was adjudicated on the merits in state court, the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") ordinarily limits significantly the scope of review. *See* 28 U.S.C. § 2254; *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).  Habeas relief under § 2254 is precluded unless the state court's adjudication of the claim resulted in a decision that was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  Further, the court must presume that factual determinations by state courts are correct, subject to rebuttal only upon a showing by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

As explained by the Supreme Court, a state court's decision "is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result."  *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citing *Williams*, 529 U.S. at 405; *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)).  The Supreme Court has likewise stated that a "state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts

in an objectively unreasonable manner." *Id.* (citing *Williams*, 529 U.S. at 405; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)).

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the holdings, as opposed to the *dicta*, of the decisions of the United States Supreme Court in precedent issued before the state court rendered its decision. *Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Yarborough v. Alvarado*, 541 U.S. 652, 660-661 (2004); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003); *see also Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998) ("[A] district court evaluating a habeas petition under § 2254(d) should survey the legal landscape at the time the state court adjudicated the petitioner's claim to determine the applicable Supreme Court authority" (internal quotation marks and citation omitted), o*verruled on other grounds by Williams*, as stated in *Parker v. Head*, 244 F.3d 813, 835 (11th Cir. 2001)). But "clearly established Federal law" does not include decisions of lower courts. *Renico v. Lett*, 559 U.S. 766, 778-79 (2010).

As the Supreme Court explained, "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico,* 559 U.S. at 773 (citations and internal quotation marks omitted). For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (quoting *Williams*, 529 U.S. at 410). "Indeed, 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Renico*, 559 U.S. at 773 (quoting *Williams*, 529 U.S. at 411).

Rather,

> [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). . . . "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Ibid.* "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (internal quotation marks omitted).

*Harrington*, 562 U.S. at 101.[13]

Likewise, "a state-court factual determination is not unreasonable [for purposes of § 2254(d)(2)] merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the [state] trial court's ... determination.'" *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341-342 (2006)).

Having set forth the applicable standard of review, the court addresses Hernandez's exhausted claims in turn.

## 1.    Denial of Acquittal: Insufficient Evidence of Intent (Claim 1)

Hernandez contends the evidence at trial consisted of a telephone conversation on the day of the incident in which Mr. X gave him directions to a meeting. (Doc. 1 at 8). At the meeting, Mr. X said the word "fifteen" and gave Hernandez "a closed opaque piece of luggage." (*Id.*). Hernandez's first claim in the instant petition is that this evidence was insufficient to show he

---

[13] This opinion omits from quoted material all parallel citations to Supreme Court opinions.

knew the luggage contained cocaine, much less that it contained over ten kilos. (*Id*.). So, Hernandez claims the trial court's failure to order a judgment of acquittal based on the evidentiary insufficiencies ran afoul of the Sixth and Fourteenth Amendments. (*Id*.) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)).

The Due Process Clause of the Fourteenth Amendment, not the Sixth Amendment, governs claims challenging sufficiency of the evidence. *Jackson,* 443 U.S. at 316; *Thompson v. Nagle,* 118 F.3d 1442, 1448 (11th Cir.1997). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319. Under *Jackson*, state law determines a criminal offense's substantive elements, "but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012).

Accordingly, thecourt begins with the Court of Criminal Appeals' findings, which include the trial evidence and Alabama's Trafficking in Cocaine statute, as well as the appellate court's decision, which Hernandez contends is contrary to or an unreasonable application of *Jackson*.

The Court of Criminal Appeals found:

> Special Agent Preston Rosenhan, of the Los Angeles, California field division of the United States Drug Enforcement Administration (DEA), testified that a confidential source, who was a truck driver, had given information that his division planned on conducting surveillance of a planned buy of fifteen kilograms of cocaine to be transferred to the confidential informant (C.I.) from someone named "Julio." (R. 133.) The destination for the cocaine was understood to be Atlanta; however, the cocaine was initially intended to be transported to Birmingham. Special Agent Rosenhan was in the parking lot where the transaction occurred but was unable to observe the offense. He testified that he and another agent were intended to maintain surveillance of the C.I. until the cocaine was retrieved following the transaction. The cocaine was transported

from California to Birmingham by a commercial airplane. It was then turned over to an agent with the DEA in Birmingham and the C.I. drove to Birmingham. Special Agent Rosenhan testified that the C.I. received two payments for his role in this case; one payment of $3,500 and another of $2,000. On cross-examination, Special Agent Rosenhan acknowledged that he did not know who "Julio" was, nor did he know Hernandez or his accomplice, Derrick Breeding. He testified that he believed that telephone calls were recorded between the C.I. and Hernandez after the C.I. had arrived in Birmingham.

Special Agent Donald Bennett of the DEA testified that he was present in Birmingham at the Flying J Truck Stop to supply technical support for the controlled buy and to record video footage of the incident. He testified that, although he did not make contact with the C.I. during the incident, Special Agent Bennett knew who the C.I. was, what he was wearing, and when he arrived. He stated that he had met with Special Agent Rosenhan concerning the events that had transpired in Los Angeles and what was then to transpire in Birmingham. He testified: "Evidently information came in from L.A. regarding a controlled delivery of fifteen kilograms of cocaine. And at that particular time, the operation – given the operation, we did a briefing regarding this controlled delivery where I took the surveillance platform and went out to the target location where the actual delivery would take place." (R. 155.) Special Agent Bennett, who was operating the camera at the scene, testified that the C.I., who was "outfitted" with a "communication device," arrived first and that the target then arrived. (R. 156.) Special Agent Bennett stated that he observed a black Maxima vehicle arrive that was being driven by a black male and carried a Hispanic male passenger. The vehicle parked approximately two parking spaces from the surveillance platform. [Special Agent Bennett testified that he recorded the transaction from a vehicle.] The Hispanic man got out and walked over to the C.I. and they talked for "a little while." (R. 159.) Then, they walked to the Maxima vehicle and opened the trunk where the rolling suit case, that contained the fifteen kilograms of cocaine, was placed. They then walked into the gas station/restaurant (the Flying J Truck Stop) adjacent to the parking lot for a short time. The Hispanic male exited the establishment and drove away in the Maxima vehicle. Special Agent Bennett identified Hernandez in court as the Hispanic male.

Special Agent Michael Cuento, of the DEA, testified that he was notified that the DEA agents from Los Angeles wanted to conduct a controlled drug buy and he was present on the scene as a supervisor; he had also aided in the investigation. He met with the C.I. prior to the offense and, at the scene, he maintained contact with the C.I. through the transmitter/recording device. He was not able to see him from his location by the gas pumps. Special Agent Cuento stated that most of the agents at the scene were able to listen to the transaction. He confirmed that he could speak Spanish.

Bianca Taylor testified that she was a paralegal in a bilingual capacity, as well as a trial technician, with the Jefferson County District Attorney's Office. She testified that her native or first language was Spanish and that she learned English as a secondary language. She transcribed the offense and translated it into English and at court was accepted as an expert in "the field of forensic transcript translator." (R. 212.) She testified that she also provided the video of the offense with English subtitles. She testified that from listening to the recording she could identify the speakers as having come from Mexico City, Mexico, because such citizens have "a very distinctive accent." (R. 227.)

Special Agent Patrick Wilson, of the Birmingham DEA, testified that he was contacted by the Los Angeles office of the DEA concerning this case. He repeated the information that the Birmingham agents received and the set-up details of the controlled buy and confirmed the accuracy of the evidence of the buy. He stated that he first made contact with the C.I. on the telephone on the day of the offense while the C.I. was driving to Birmingham. He confirmed the accuracy of what was expected to occur in Birmingham and then met with him. Special Agent Wilson then directed the C.I. to follow him to another location near to the Flying J Truck Stop where he ensured that the teams were set-up. He placed the surveillance equipment on the C.I. and then drove him to the truck stop where the C.I. had left his vehicle. He testified that: "Being familiar with the operation, having planned it myself, and also being familiar with what I personally told the informant to do and to say, and also being familiar with what the informant told me, I was able to listen to what transpired. And I had an understanding of what was being said and what was being referred to." (R. 240.) Special Agent Wilson testified that he observed the black Maxima drive slowly around the parking lot before pulling up to the corner where the C.I. was standing. He heard the C.I. on the telephone apparently giving directions to someone before the Maxima vehicle approached him. Special Agent Wilson identified Hernandez in court as the man whom he observed exit the black Maxima and approach the C.I. He testified that he observed Hernandez speaking with the C.I. and, because he speaks Spanish, he understood the majority of the conversation. He stated that he watched the suitcase, that had been provided by the DEA, being placed in the trunk of the Maxima vehicle. Special Agent Wilson testified that when Hernandez left the scene, he and the rest of his team followed the Maxima vehicle until the vehicle was stopped by a Birmingham police car, which stop had been prearranged. The stop transpired pursuant to an arrangement whereby certain Birmingham police units where to be assigned to a specific location for surveillance. They were instructed that, if they observed any traffic violation by the vehicle, they were to use that as a pretext to pull the vehicle over. Special Agent Wilson testified that the reason for the stop was solely to protect the C.I. He stated that, had the arrest transpired at the Flying J Truck Stop, the C.I.'s role and safety would have been jeopardized. He further testified that "[i]t's very

possible that the informant's family that may still live in Mexico could be threatened and possibly even injured or killed." (R. 248.) While he was not present at the scene of the stop, Special Agent Wilson testified that he, and a number of agents, observed the stop through binoculars. He testified that the wholesale value of the fifteen kilograms of cocaine was approximately $450,000, but if the cocaine had been sold in smaller amounts with some fillers, it would have had a greater value.

Officer Phillip Waid, of the Birmingham Police Department's K-9 Unit, testified that he was notified by the DEA that his assistance may be required as to the drug buy. Officer Michael Turner of the Birmingham Police Department told him that "there would be a vehicle coming down the interstate with a load of cocaine and that he was requested to conduct a traffic stop on it. And if he [the driver] refused consent, then he may need the dog. So that's how I became involved." (R. 283.) On the day of the offense, Officer Turner called him and told him that there had been a refusal. Officer Waid testified that when he arrived, he began to check the Maxima vehicle with the drug dog which "showed a change of behavior on the driver's door, which is consistent to him smelling the odor of narcotics." (R. 283.) The dog then attempted to find the source of the odor and eventually responded to the right-side, rear wheel well. Officer Turner then began searching the vehicle, and opened the trunk. A suitcase containing the cocaine was found inside.

Officer Michael Turner, of the Narcotics Highway Drug Interdiction Unit of the Birmingham Police Department, testified that he observed a black Maxima vehicle drive by him, following too closely behind a tractor-trailer truck. He stated that when he stopped the vehicle and spoke to the driver, the passenger refused to make eye contact and stared straight ahead "like a statue." (R. 294.) He identified Hernandez in court as the passenger. Officer Turner testified that the driver was unreasonably nervous. The driver acknowledged that he knew the reason for the stop and Officer Turner wrote up the citation. He then asked the driver to exit the vehicle and walk to the rear of the car, so that he could explain the ticketing procedures and court date to him and return his documentation. Officer Turner asked permission to search the Maxima vehicle and the driver refused. Officer Turner acknowledged that he had been previously informed by agents of the DEA that there was to be a controlled delivery of fifteen kilograms of cocaine and that the perpetrators would be traveling through Birmingham at an approximate time. He was also told that he was to conduct a traffic stop. He was instructed that he could stop the vehicle pursuant to *Carroll v. United States*, 267 U.S. 132 (1925)(a police officer may stop a vehicle if he has probable cause to believe that illegal contraband is contained therein); however, instead, he decided to stop the vehicle pursuant to "[his] own probable cause to protect the confidentiality of –- the identity of the confidential informant." (R. 296.) He confirmed that the DEA agents had told him that they wanted him to find a

legitimate, legal reason to stop the vehicle. He stated that after he had issued the citation and asked the driver some questions, the driver appeared extremely nervous, and his eyes and mouth began twitching. He also noticed that there was a single key in the ignition which he referred to as a third party key, and explained that "most of the time when you're dealing with drugs and mules-- what we call 'mules' -- they normally have drugs inside of vehicles that do not belong to them. It normally belongs to a third party. And there's not house keys or anything like that on it. It's just a key by itself that just goes to that vehicle -—— the vehicle that's assigned to deliver the drugs." (R. 303.) He also noted that Hernandez had stiffened his body and would not look at Officer Turner. Lastly, a *Holy Bible* was visible in the car and, during his training, he had learned that certain mules believe that the Bible protects them from police. Based on these observations, Officer Wilson asked for permission to search the vehicle. The driver refused and became agitated. Because the driver was a much larger man than Officer Turner, he decided to place him in the back of the patrol car. Officer Turner then asked Hernandez to exit the vehicle, and he was patted down and taken to the front of the patrol car. There was a camera in the front of the patrol car that recorded Officer Turner's exchange with Hernandez. A police dog then walked around the Maxima vehicle, conducting a "'free-air search.'" (R. 307.) The dog gave a positive indication that drugs were present, which, Officer Turner testified, "gives me probable cause to search the vehicle." (R. 307.) He found the cocaine in a suitcase in the trunk of the Maxima vehicle. According to Officer Turner, Hernandez and the driver were then arrested.

(Doc. 12-1 at 2-6) (footnote incorporated into body of text).

On direct appeal, Hernandez raised the same issues asserted in claim one of the instant petition: (1) "the evidence was insufficient to prove that he had the requisite knowledge that cocaine was contained in the suitcase;" and (2) the evidence was insufficient because it consisted of "only speculation and the inference that, because there was fifteen kilograms of cocaine in the suitcase, [he] knew the suitcase in fact contained cocaine in that amount." (Doc. 12-1 at 7). The Court of Criminal Appeals rejected the claim, finding that "the State presented sufficient evidence to support the jury's verdict of guilt." (*Id.* at 10).

The appellate court reasoned:

"In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution." *Ballenger v. State*, 720 So. 2d 1033, 1034 (Ala. Crim. App. 1998), quoting *Faircloth v. State*, 471 So. 2d 485, 488 (Ala. Crim. App. 1984), aff'd, 471 So. 2d 493 (Ala. 1985). "The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt." *Nunn v. State*, 697 So. 2d 497, 498 (Ala. Crim. App. 1997), quoting *O'Neal v. State*, 602 So. 2d 462, 464 (Ala. Crim. App. 1992). "When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit the case to the jury, and, in such a case, this court will not disturb the trial court's decision." *Farrior v. State*, 728 So. 2d 691, 696 (Ala. Crim. App. 1998), quoting *Ward v. State*, 557 So. 2d 848, 850 (Ala. Crim. App. 1990). The role of appellate courts is not to say what the facts are. Our role is to judge whether the evidence is legally sufficient to allow submission of an issue for decision by the jury. *Ex parte Bankston*, 358 So. 2d 1040, 1042 (Ala. 1978) (emphasis added).

> In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. *United States v. Black*, 497 F.2d 1039 (5th Cir. 1974); *United States v. McGlamory*, 441 F.2d 130 (5th Cir. 1971); *Clark v. United States*, 293 F.2d 445 (5th Cir. 1961).

*Cumbo v. State*, 368 So. 2d 871, 874 (Ala. Crim. App. 1978).

*Jennings v. State*, 965 So. 2d 1112, 1141 (Ala. Crim. App. 2006).

Section 13A-12-231(2), Ala. Code 1975, provides that "any person who knowingly sells, manufactures, delivers, or brings into this state, or who is

knowingly in actual or constructive possession of, 28 grams or more of cocaine or of any mixture containing cocaine, described in Section 20-2-25(1), is guilty of a felony, which felony shall be known as 'trafficking in cocaine.'"   "Guilty knowledge may be proved by evidence of acts or conduct of the accused from which such knowledge may fairly be inferred. *Donahoo v. State*, 505 So. 2d 1067 (Ala. Cr. App. 1986)." *Ricketson v. State*, 766 So. 2d 981, 982 (Ala. Crim. App. 2000).   The State presented sufficient evidence to tie Hernandez to the cocaine and to prove that Hernandez knew that the suitcase contained cocaine. *See Bradford v. State*, 948 So. 2d 574, 580 (Ala. Crim. App. 2006)("the jury could have inferred from the testimony regarding Bradford's conduct and actions that he knew the marijuana was in the back of the Expedition.").   Hernandez had actual possession of the cocaine as evidenced by his handling of the suitcase and placing it in the trunk of the Maxima vehicle.   He was monitored and recorded when taking the suitcase in Birmingham from the C.I. and both he and his accomplice behaved in a guilty manner when they were stopped by Officer Wilson. *See Lang v. State*, 766 So. 2d 208, 210 (Ala. Crim. App. 1999) ("The appellant specifically argues that the State failed to prove that he knew that the suitcase he picked up from Cook and Kellum contained marijuana.   However, Officer Skaggs testified that the appellant told him that he had thought the suitcase was filled with marijuana, although the marijuana was not his.   This evidence, in conjunction with testimony that the appellant seemed overly anxious to pick up his suitcase provided sufficient evidence to show that the appellant knew that the suitcase contained marijuana.").   The substance in the suitcase was established to have been cocaine.

Moreover, there is no requirement in Alabama that a defendant know the amount of the cocaine that he or she possesses.

The Court of Criminal Appeals has consistently interpreted the various subsections of § 13A–12–231 as requiring the State to prove the knowing possession of the controlled substance, but not knowledge of the actual quantity possessed. *See Harris v. State*, 826 So.2d 897, 898 (Ala. Crim. App. 2000) ("In order to present a prima facie case of trafficking in cocaine, the State must prove that the defendant was knowingly in actual or constructive possession of 28 grams or more of cocaine. *Korreckt v. State*, 507 So. 2d 558 (Ala. Crim. App. 1986).   The state is not required to prove that the defendant knew that the cocaine in his possession weighed 28 grams or more."). *See also Insley v. State*, 591 So. 2d 589, 591 (Ala. Crim. App. 1991) ("In a prosecution for trafficking in marihuana, the State need not prove that the defendant knew the weight of the marihuana proved to be in the defendant's possession.").   This Court has also stated that the State must prove

19

only that the defendant was knowingly in possession of a quantity of the illegal substance exceeding the quantity required under the trafficking statute. *See Ex parte Presley*, 587 So. 2d 1022, 1023 (Ala. 1991).

*Ex parte Washington*, 818 So. 2d 424, 426 (Ala. 2001). *See also State v. Shelman*, 159 N.C. App. 300, 306, 584 S.E. 2d 88, 93 (N.C. App. 2003)("We discern no legal basis for grafting a new essential element -- knowledge of the weight of the drugs -- onto the offense of trafficking in methamphetamine. We hold, therefore, that to convict an individual of drug trafficking, the State is not required to prove that defendant had knowledge of the weight or amount of methamphetamine which he knowingly possessed or transported. Instead, the statute requires only that the defendant knowingly possess or transport the controlled substances; if the amount exceeds 28 grams, then a conviction for trafficking may be obtained.").

(*Id.* at 7-10) (extraneous quotation marks omitted) (alterations incorporated). Accordingly, the appellate court rejected this claim on direct appeal.

Hernandez argues the only evidence against him at trial consisted of driving instructions given to him by Mr. X; his acceptance of a closed, opaque suitcase; and the utterance of the word "fifteen." (Doc. 1 at 8). From this platform, Hernandez asserts the jury unfairly inferred and speculated that he knew the bag contained more than ten kilos of cocaine. (*Id.* at 9). Hernandez contends reasonable jurists could disagree with the appellate court's rejection of this claim because then-Chief Justice Moore dissented from the Alabama Supreme Court's denial of Hernandez's petition for writ of *certiorari* on direct appeal. (*Id*. at 6). The dissent questioned the sufficiency of the evidence on the same grounds raised here and opined *certiorari* should be granted "to examine the record on the question of whether a rational jury could conclude beyond a reasonable doubt from the evidence presented at trial that Hernandez knew that the suitcase he had received from the informant contained 10 or more kilograms of cocaine." (Doc. 12-2 at 3-5).

Considering the gravity of the potential sentence and the unavailability of Mr. X, Hernandez also points to evidence the prosecution did not present, different tactics law enforcement could have employed, and possible evidence that could have been presented for a "more thorough unearthing of the truth."  (Doc. 1 at 9-11).  Specifically, Hernandez complains: (1) the prosecution did not present any evidence establishing the luggage was inordinately heavy or otherwise suspicious; (2) if Mr. X's handlers wanted to establish Hernandez knew the luggage contained cocaine, they could have instructed Mr. X to refer to the drug during the transaction; (3) law enforcement agencies could have recorded any communications between himself and Mr. X prior to the delivery date; (4) the record does not show whether Julio—who delivered the cocaine in California—also traded in other illicit goods; and (5) the case could have been brought in federal court, where Mr. X's testimony could be required.  (*Id.*).

"The 'critical inquiry' for § 2254 challenges to the sufficiency of the evidence supporting a state conviction 'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Owen v. Sec'y for Dep't of Corr.*, 568 F.3d 894, 918 (11th Cir. 2009) (quoting *Jackson,* 443 U.S. at 318–19) (emphasis in original).  "The government's proof need not rule out every theory except guilt beyond a reasonable doubt."  *Bishop v. Kelso,* 914 F.2d 1468, 1470 (11th Cir. 1990); *United States v. Garcia*, 447 F.3d 1327, 1334 (11th Cir. 2006) (quoting *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc) ("It is not necessary for the evidence to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.")).

As the Eleventh Circuit has noted,

When the record reflects facts that support conflicting inferences, there is a presumption that the jury resolved those conflicts in favor of the prosecution and against the defendant. In other words, federal courts must defer to the judgment of the jury in assigning credibility to the witnesses and in weighing the evidence. *See Jackson,* 443 U.S. at 326; *Wilcox v. Ford,* 813 F.2d 1140, 1146 (11th Cir. 1987).

*Johnson v. Alabama*, 256 F.3d 1156, 1172 (11th Cir. 2001).

And the Supreme Court elaborated that

*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith,* 565 U.S. 1, 2 (2011) (*per curiam*). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett,* 559 U.S. 766, [773] (2010)).

*Coleman*, 566 U.S. at 65 (alterations incorporated).

The undersigned concludes the state appellate court's rejection of Hernandez's claim was neither contrary to, nor an unreasonable application of, *Jackson* and its progeny. Although the standard the Court of Criminal Appeals enunciated is not precisely identical to the *Jackson* standard, the opinion shows the court viewed the evidence in the light most favorable to the prosecution and reasonably concluded a rational trier of fact could have found the essential elements of trafficking beyond a reasonable doubt based on the evidence presented at trial. The state court also reasonably determined the State presented legally sufficient evidence regarding intent to overcome the motion for judgement of acquittal.

Hernandez's (and former Chief Justice Moore's) narrow focus on Mr. X's driving instructions, the unopened opaque bag, and the word "fifteen" ignores the Court of Criminal Appeals' description of the plethora of circumstantial evidence admitted at trial against him. The appellate court found the transaction and "numerous conversations leading up to the transaction in question are audio recorded and the transaction itself is recorded in audio and video." (Doc. 12-1 at 11) (internal citation omitted). The appellate opinion also noted the "DVD with English subtitles captured the entire delivery, and shows Hernandez take the suitcase, roll it over to the Maxima vehicle, and place it in the trunk. After more discussion with the C.I. concerning upcoming deliveries, he leaves in the Maxima." (*Id.* at 13) (footnote omitted).

The transcript of Hernandez and Mr. X's conversation reveals they discussed "loads" Mr. X had for the next few days, irritation regarding the delivery dates, and the following exchange:

Hernandez: "Okay well, right now."

Mr. X: "Here. There is the f***ing luggage."

Hernandez: "Yes. How much is it."

Mr. X: "Uh, he said it was 15."

Hernandez: "Ah fine."

(Doc. 17-18 at 8-9). The two men then discuss meeting for additional deliveries. (*Id.* at 9-14). The Court of Criminal Appeals also noted Officer Turner's observations and interactions with Hernandez during the traffic stop.

Hernandez does not assert the Court of Criminal Appeals' opinion concerning the circumstantial nature of the evidence against him is contrary to, or an unreasonable application of, clearly established law. Any such argument would have been meritless. Circumstantial

evidence suffices to support a criminal conviction. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required. See *Holland v. United States,* 348 U.S. 121, 140 (1954) (observing that, in criminal cases, circumstantial evidence is 'intrinsically no different from testimonial evidence'). And juries are routinely instructed that '[t]he law makes no distinction between the weight or value to be given to either direct or circumstantial evidence.' 1A K. O'Malley, J. Grenig, & W. Lee, Federal Jury Practice and Instructions, Criminal § 12.04 (5th ed. 2000); see also 4 L. Sand, J. Siffert, W. Loughlin, S. Reiss, & N. Batterman, Modern Federal Jury Instructions ¶ 74.01 (2002) (model instruction 74–2).").

Hernandez also ignores that "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.' This deferential standard does not permit" a refusal to acknowledge evidence presented at trial or "the type of fine-grained factual parsing" Hernandez suggests. *Coleman*, 566 U.S. at 655 (citations omitted). The court cannot ignore or reweigh the circumstantial evidence presented or "ignore the rational inferences that could be drawn from the circumstantial evidence presented at [] trial. That would not be a proper application of the *Jackson* standard." *Head v. Gordon*, No. 09-1074-TMH, 2011 WL 6722743, at *5 (M.D. Ala. Nov. 29, 2011), *report and recommendation adopted*, 2011 WL 6440928 (M.D. Ala. Dec. 22, 2011).

Hernandez's assertions regarding the gravity of his potential sentence, Mr. X's unavailability, the lack of evidence concerning whether the bag was unusually heavy or

suspicious, the different tactics law enforcement could have used, and possible evidence that could have been presented are irrelevant to the *Jackson* analysis. *Jackson* requires the court to focus on the evidence actually presented, not whether different—and speculative—evidence or different tactics could have been used.

For the foregoing reasons, Hernandez's first claim in the instant petition lacks merit.

### 2. Non-Disclosure of Confidential Informant's Identity (Claim 2)

Mr. Hernandez's second claim in the instant petition asserts the trial court's refusal to compel the state to identify or produce Mr. X violated Hernandez's Sixth and Fourteenth Amendment rights "to compulsory process to secure witnesses and a fair trial." (Doc. 1 at 12) (citing *U.S. v. Valenzuela-Bernal*, 458 U.S. 858 (1982) ("a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the [Fourteenth] Amendment . . . requires some showing that the evidence lost would be both material and favorable to the defense"); *Washington v. Texas*, 388 U.S. 14, 18 (1967) ("The right of an accused to have compulsory process for obtaining witnesses in his favor stands on no lesser footing than the other Sixth Amendment rights we have previously held applicable to the States [by way of the Fourteenth Amendment].").

The Court of Criminal Appeals addressed this claim as follows:

> Hernandez argues that his constitutional rights were violated by the State and Federal government's failure to require the C.I. to come to court or to provide sufficient information for Hernandez to be able to find the C.I. Prior to trial, Hernandez filed a motion seeking the identity of the C.I. The trial court issued the following order:
>
> > "The Defendant previously filed a 'Request and/or Motion for Disclosure of Informant.' After a hearing on said motion, this Court entered an Order noting that it 'appears undisputed that a

confidential informant delivered the controlled substance in question. The State intends to introduce testimony from other witnesses about this transaction. The confidential informant also allegedly saw the Defendant put the controlled substance in his vehicle and drive away.' The Court's previous Order held that the confidential informant was a 'material witness' and that the State should notify defense counsel of the confidential informant's identity and either provide defense counsel with the confidential informant's address so he could be subpoenaed or allow defense counsel an opportunity to talk to the informant to determine the relevance of the informant's testimony to any defenses that may be presented. The Court was subsequently notified that the D.E.A, or federal authorities were unwilling to provide the State of Alabama or the defense with the confidential informant's address. Both parties agreed in a joint stipulation of facts filed with the Court that the limited information the D.E.A. was willing to provide 'does not permit the defendants the ability to locate and have the informant served with a necessary court order to secure his presence at trial.' The reason given for the decision not to provide defense counsel with additional information was a 'concern for his (the informant's) safety.'

"The Defendants then filed a Motion to Dismiss Indictment. Said motion asserts that the State's failure to allow the Defendants' (sic.) access to the confidential informant violates the Defendants' rights and should result in a dismissal of the indictment. In addition, Defense counsel asserted that the confidential informant may be relevant in establishing an 'entrapment' defense and that the witness could have provided material testimony about the transaction in question and 'whether or not the defendant knowingly committed the offense'.

"When this matter was initially submitted to the undersigned Judge, it appeared that the Defendants' motion should possibly be granted. Cases such as *Roviaro v. United States*, 353 U.S. 53 (1957), which would appear to support the Defendants' assertion, have noted that 'the importance of preserving the "informer privilege," or the law enforcement authorities' privilege, of withholding from disclosure is not to be treated lightly, but it does not rise above the importance of affording a fair trial to litigants.' *McElroy v. State*, 360 So. 2d 1060, 1067 (Ala. Crim. App. 1978) quoting *Roviaro*. When it initially appeared that the transaction in question had been record (sic.) by video, but not

audio, the questions of entrapment, duress, or knowledge were clearly issues the defense may want to address through cross-examination of the confidential source. Several cases addressing a similar issue have suggested that a trial court could question a potential witness, such as the confidential source in this case, "in camera" to see if the witness would be able to provide any exculpatory information. Clearly, the use of such a procedure is not possible in this case because the federal government is not willing to provide any additional information to the State prosecutors regarding the identity of the informant. Yet this case appears to be distinguishable from other cases that appear to support the defense's position. In particular, the transaction in questions (sic.) and numerous conversations leading up to the transaction in question are audio recorded and the transaction itself is recorded in audio and video. The availability of such a recording alleviates any concerns regarding the issues of duress, entrapment, or whether the defense will be unable to convey the true nature of the transaction without the informant being present. After reviewing case law from numerous states, it appears that there are many cases, in which a transaction between a defendant and a confidential informant were admitted into evidence without the informant being called as a witness. Although questions regarding the admissibility of the taped statements must be addressed at trial, this Court is of the opinion that the case is not due to be dismissed based upon the State's failure, to produce the witness in question."

(C. 28-29.)

Thereafter, near the close of the presentation of the State's evidence at trial, Hernandez renewed his motion to compel the identification and production of the C.I. However, this motion was made on a different ground; specifically, defense counsel stated that his argument at trial was based on the C.I. having been paid, as opposed to his initial argument concerning the expectation of the C.I.'s materiality. The trial court denied the motion.

Regarding the requirement that a C.I.'s identity be disclosed, this Court has stated:

"There is no fixed rule with respect to the disclosure of the identity of informants.

"'We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.' *Roviaro v. United States*, 353 U.S. 53, 62 (1957)."

*Lightfoot v. State*, 531 So. 2d 57, 58 (Ala. Crim. App. 1988). "'[W]here the alleged informer is not the only participant in the transaction who can establish the defendant's guilt, disclosure of his identity may not be automatically required.'" *Id.*

In the present case, the transaction between Hernandez and the C.I. was recorded and was later transcribed by a translator. The DVD with English subtitles captured the entire delivery, and shows Hernandez take the suitcase, roll it over to the Maxima vehicle, and place it in the trunk. After more discussion with the C.I. concerning upcoming deliveries, he leaves in the Maxima. Special Agent Bennett watched and recorded the exchange between Hernandez and the C.I. Special Agent Cuento, who speaks Spanish, was in contact with the C.I. just before the offense, and monitored and audio-recorded the transaction. He testified that most of the agents present were listening to the conversation. *Compare Marshall v. State*, 43 So. 3d 1 (Ala. Crim. App. 2009)(State should have disclosed C.I.'s identity otherwise his hearsay statements to police officers should have been excluded because the statements were introduced as substantive evidence of guilt and were the only evidence that connected defendant to cocaine found in house).

Moreover, because the Federal government refused to release the C.I.'s identity to the State, the C.I. was unavailable as a witness.

"The Supreme Court requires balancing competing interests, *id.* at 62, and this court has found that this inquiry principally involves consideration of three factors: (1) 'the extent of the informant's participation in the criminal activity'; (2) 'the directness of the relationship between the defendant's asserted defense and the probable testimony of the informant'; and (3) 'the government's interest in nondisclosure.' *United States v. Tenorio–Angel*, 756 F.2d 1505, 1509 (11th Cir. 1985). 'The government's interest may

be proven by showing that disclosure might endanger the informant or other investigations.' *Id*."

*U.S. v. Flores*, 572 F.3d 1254, 1265 (11th Cir. 2009). The federal agents argued that the informant's safety would be jeopardized if it was disclosed. Moreover, Hernandez's defense alleged that he was unaware of what was in the suitcase. There is no indication or allegation that the C.I. would have provided testimony as to that issue. When a defendant seeks to compel the government to provide access to a potential but otherwise unavailable witness, the defendant bears the burden of demonstrating that the witness's anticipated information "would be both material and favorable to the defense." *United States v. Valenzuela–Bernal*, 458 U.S. 858, 873 (1982). A witness's anticipated testimony is material if it might affect the outcome of the trial. *See id*. at 868. Hernandez has not met this burden.

"'The question of disclosure or nondisclosure of the identity of a confidential police informant is a matter within the sound discretion of the trial court, and we will not overturn the trial court's decision absent an abuse of that discretion. *See Ex parte Pugh*, 493 So. 2d 393, 397 (Ala. 1986).'" *Revis v. State*, 101 So. 3d 247, 275 (Ala. Crim. App. 2011), quoting *May v. State*, 710 So. 2d 1362, 1369 (Ala. Crim. App. 1997). In the present case, the trial court did not abuse its discretion by failing to require the disclosure of the C.I.

(Doc. 12-1 at 10-14) (parallel citations omitted) (footnote omitted).

Here, the Court of Criminal Appeals correctly noted the Supreme Court's disavowal of a fixed disclosure rule in favor of a rule "balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro*, 353 U.S. at 61-62. The Court of Criminal Appeals also applied *Roviaro* in light of Eleventh Circuit precedent regarding the proper balance between the public interest and Hernandez's right to prepare his defense. Faced with questions of C.I. disclosure post-*Roviaro*, the Eleventh Circuit applies three factors: "the extent of the informant's participation in the criminal activity, the directness of the relationship between the defendant's asserted defense and the probable testimony of the informant, and the government's interest in nondisclosure." *United States v. Tenorio-Angel*, 756 F.2d 1505, 1509 (11th Cir. 1985). The court addresses each Eleventh Circuit factor in turn.

First, as to participation in criminal activity, Mr. X clearly played a pivotal role in the drug transaction at issue. However, video and audio recordings—translated by a certified translator and admitted into evidence—preserved the entire transaction. Moreover, law enforcement officers watched the transaction and were privy to the conversations between Mr. X and Hernandez in real time. Unlike the circumstances presented in *Roviaro*, Mr. X was "not the only witness in a position to amplify or contradict the testimony of government witnesses" to the transaction. 353 U.S. at 64. Also unlike *Roviaro*, no government witness testified Mr. X denied knowing or seeing Hernandez; nor did any government witness testify to any conversations between Hernandez and Mr. X on the day of the offense that were not preserved in video and audio recordings. *Id.* at 64-65. Accordingly, Mr. X's significant role in the transaction does not, standing along, require disclosure of his identity.

The second factor, the relationship between the defense and Mr. X's probable testimony, weighs against Hernandez. Hernandez must "make some plausible showing that the evidence lost would be both material and favorable to the defense." *United States v. Diaz*, 156 F. App'x 223, 224 (11th Cir. 2005); *see also*, *Valenzuela-Bernal*, 458 U.S. at 867 (the Sixth Amendment guarantees a defendant "compulsory process for obtaining *witnesses in his favor*" and thus requires a defendant to show he was "arbitrarily deprived . . . of 'testimony [that] would have been *relevant* and *material*, and ... *vital* to the defense.'"). "Evidence is material if there is a reasonable likelihood that it would have affected the judgment of the trier of fact." *Id.* (citing *United States v. Bagley,* 473 U.S. 667, 681-82 (1985)). Evidence is favorable "if the informant's testimony would significantly aid in establishing an asserted defense. Mere

conjecture about the possible relevance of the testimony is insufficient to compel disclosure." *United States v. Johnson*, 702 F. App'x 815, 816 (11th Cir. 2017).

Here, Hernandez's defense was his lack of knowledge that the suitcase contained cocaine. But Hernandez has never identified Mr. X's probable testimony, much less established how the testimony would be favorable to his defense. *Johnson*, 702 F. App'x at 816 ("The burden is on the appellant to show that the informant's testimony would significantly aid in establishing an asserted defense."). Hernandez argues his "pleadings [have] shown extensive reasons why the testimony of Mr. X would be helpful, and why there are remarkable evidentiary gaps in his absence." (Doc. 1 at 13).

The only specific evidentiary gap identified in the instant petition is the absence of evidence showing what Mr. X said to Hernandez leading up to the truck stop meeting. Hernandez claims that, absent Mr. X's testimony, it was impossible to know "what he would be bringing to that meeting." (*Id.*). This argument does not reveal Mr. X's probable testimony, its materiality, or its favorability to the defense. Thus, the Court of Criminal Appeals reasonably found Hernandez failed to make the requisite plausible showing. Review of the other potential evidentiary gaps identified in Hernandez's habeas pleadings reveals the same defects.

As to the final balancing factor, the Court of Criminal Appeals identified the general purposes of the privilege: the government's "need to encourage cooperation with authorities," the State's expressed need to safeguard the informant and his family, and the unavailability of Mr. X because of the D.E.A.'s refusal—on the same grounds—to identify him. *See U.S. v. Young*, 161 F. App'x. 922, 928 (11th Cir. 2006).

While Hernandez asserts the federal government "probably" chose to let the State prosecute the case "to create a purported shield against" its obligation to identity Mr. X, Hernandez does not offer any facts to support this belief. (Doc. 1 at 14). Hernandez also argues no evidence showed a credible threat to Mr. X's safety. (*Id.* at 14-15). Even if identifying Mr. X could endanger him, Hernandez claims the danger was limited to "keeping [his] status as informant secret on the day of the arrest," but subsided by the time of trial. (*Id.* at 14-15). Hernandez contends informants regularly testify in trafficking cases and the state presented no evidence to show Mr. X's circumstances were particularly "sensitive." (*Id.* at 15).

Contrary to Hernandez's arguments, the trial court heard—and the appellate court accurately quoted—evidence of danger associated with identifying Mr. X. Agent Wilson testified Hernandez was not arrested at the Flying J truck stop "to shield the involvement of the confidential informant." (Doc. 17-9 at 51). Wilson explained that an arrest at the truck stop would have led Hernandez immediately to assume Mr. X was cooperating with law enforcement, jeopardizing his life. Wilson further noted the possibility "that the informant's family that may still live in Mexico could be threatened and possibly even injured or killed." (*Id.* at 51-52).

Reasonable jurists also could reject Hernandez's argument that the danger to Mr. X and his family decreased as Hernandez's trial drew closer. Common sense dictates the danger to Mr. X began at least as early as the time of Hernandez's arrest and either remained stable or increased as the trial date approached. The value and amount of cocaine involved, as well as Mr. X's involvement in additional transactions, support the State's concerns for Mr. X and his family. Finally, Hernandez points to no Supreme Court case requiring a court to study a particular

danger to Mr. X—as compared to other confidential informants testifying in other cases—to support a nondisclosure decision.

For the foregoing reasons, the court concludes the Court of Criminal Appeals identified and reasonably applied Supreme Court precedent in determining the nondisclosure of Mr. X's identity; the appellate court struck the proper balance between the public interest and Hernandez's right to a defense. Accordingly, Hernandez's second claim here is due to be denied on the merits.

### 3. Discretion Regarding Sentence (Claim 4)

Hernandez claims the sentencing court "erred in concluding it had no discretion with regard to the sentence of life without the possibility of parole," in violation of the Eighth and Fourteenth Amendments. (Doc. 1 at 20) (citing *Harmelin v. Michigan*, 501 U.S. 957 (1991)). Since *Harmelin's* holding is based solely on Eighth Amendment jurisprudence, the undersigned presumes Hernandez refers to the Fourteenth Amendment's application of the Eighth Amendment to the states.

On direct appeal, the Court of Criminal Appeals found:

> Hernandez argues that the trial court erred by concluding that it had no discretion with regard to his sentence of life without the possibility of parole. Specifically, he contends that, based on the language of § 13A-12-231(2)(d), Ala. Code 1975, the trial court improperly concluded that he had no discretion as to Hernandez's sentence. Hernandez argues that the legislature only intended this sentence to apply to "drug baron's."[5]

> [5] In *Wilson v. State*, 830 So. 2d 765, 778 (Ala. Crim. App. 2001), this Court stated: "Act No. 86–534, codified at § 13A–12–231, Ala. Code 1975, under which Wilson was charged, is titled the 'Drug Baron's Enforcement Act of 1986.' All of the provisions of the act relate to large quantities of drugs, and the title indicates the Legislature's intent to punish severely the 'drug barons,' i.e., those who

habitually trade in and profit from dealing in large quantities of drugs. Wilson does not fit into that category."]

. . . .

The facts in *Wilson v. State*, 830 So. 2d 765 (Ala. Crim. App. 2001) differ from those in the instant case. In *Wilson*, the defendant was a first-time offender who sold Valium and Florinal tablets to an undercover officer for $90. When the officer asked what else she could provide him, she responded that she could get liquid morphine from a neighbor, whose husband had been prescribed the medication, and sell it for her to him. She attempted to sell it for $150 so that she could pay the neighbor $70 and keep $80. The officer gave her $110 for the morphine mixture. Here, Hernandez transported a suitcase containing narcotics between parties. According to his statements made on the DVD, introduced as State's Exhibit 1, he had other upcoming transports. His involvement in trafficking in narcotics was far different from that of Wilson. Moreover, the impact of his involvement on society in general was far different. His role fell under the type requiring the mandatory life without parole sentence established by the Legislature.

> "'The Eighth Amendment ... contains a "narrow proportionality principle" that "applies to noncapital sentences."' *Ewing v. California*, 538 U.S. 11, 17 (2003), quoting *Harmelin v. Michigan*, 501 U.S. 957, 996–97 (1991). We recognized this limited principle in *Wilson v. State*, 830 So. 2d 765 (Ala. Crim. App. 2001).

> "In *Wilson*, a majority of this Court held that a first-time offender's sentence of life imprisonment without the possibility of parole for selling a substance containing morphine constituted cruel and unusual punishment. We noted that in order to conduct a full-scale *Solem v. Helm*, 463 U.S. 277 (1983), analysis we must first determine whether the sentence is grossly disproportionate to the crime for which the defendant is being sentenced.

>> "'Application of *Harmelin v. Michigan*, 501 U.S. 957 (1991), mandates that we make a threshold determination in this case by considering whether the mandatory sentence of life imprisonment without parole imposed in Wilson's case is grossly disproportionate to her crime. To perform this analysis, we must consider the gravity of the offense and the harshness of the punishment. *Solem*

34

*v. Helm,* 463 U.S. 277 at 290–91 (1983). The United States Supreme Court noted in *Solem* that no single factor determines when a sentence is grossly disproportionate, and it offered a nonexhaustive list of factors to be considered when a court is assessing the severity of a crime. These factors include consideration of the circumstances of the crime, the harm caused to the victim or to society, the culpability of the offender, and the offender's motive in committing the crime. *Id.* at 290–94.'

"830 So. 2d at 778 (emphasis added). *See Smallwood v. Johnson*, 73 F. 3d 1343, 1347–48 (5th Cir. 1996) ('In light of *Harmelin v. Michigan*, 501 U.S. 957 (1991), it appears that *Solem* is to apply only when a threshold comparison of the crime committed to the sentence imposed leads to an inference of "gross disproportionality."').

"""It is well settled that 'where a trial judge imposes a sentence within the statutory range, this Court will not disturb that sentence on appeal absent a showing of an abuse of the trial judge's discretion.' *Alderman v. State*, 615 So. 2d 640, 649 (Ala. Crim. App. 1992). 'The exception to this general rule is that "the appellate courts may review a sentence, which, although within the prescribed limitations, is so disproportionate to the offense charged that it constitutes a violation of a defendant's Eighth Amendment rights."' *Brown v. State*, 611 So. 2d 1194, 1197, n. 6 (Ala. Crim. App. 1992), quoting *Ex parte Maddox*, 502 So. 2d 786, 789 (Ala. 1986).'

"'*Adams v. State*, 815 So. 2d 583, 585 (Ala. Crim. App. 2001).

"'Ware was given a heightened sentence under the Habitual Felony Offender Act, § 13A–5–9, Ala. Code 1975. Legislatively mandated sentences carry a presumption of validity. *McLester v. State*, 460 So. 2d 870, 874 (Ala. Crim. App. 1984). "'Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the

types and limits of punishments for crimes...."' 460
So. 2d at 874, quoting *Solem v. Helm*, 463 U.S. 277,
290 (1983). "'"Where the punishment prescribed
by the legislature is severe merely by reason of its
extent, as distinguished from its nature, there is no
collision with the Eighth Amendment."'" *Wilson v.
State*, 427 So. 2d 148, 152 (Ala. Crim. App. 1983)
(quoting *Watson v. State*, 392 So. 2d 1274, 1277
(Ala. Crim. App. 1980), quoting in turn *Ex parte
Messelt v. State*, 351 So. 2d 636, 639 (Ala. Crim.
App. 1977)). Likewise, this Court has held that the
Habitual Felony Offender Act does not violate the
Cruel and Unusual Punishment Clause of the Eighth
Amendment. *See Watson v. State*, 392 So. 2d 1274
(Ala. Crim. App. 1980).'

"*Ware v. State*, 949 So. 2d 169, 183 (Ala. Crim. App. 2006)."

*Lane v. State*, 66 So. 3d 830, 831-32 (Ala. Crim. App. 2010). The United States
Supreme court acknowledged in *Solem*, "We agree, therefore, that, 'outside the
context of capital punishment, successful challenges to the proportionality of
particular sentences will be exceedingly rare'". 463 U.S. at 289-90. "Severe,
mandatory penalties may be cruel, but they are not unusual in the constitutional
sense ...." *Harmelin v. Michigan*, 501 U.S. 957, 994 (1991) (holding that
mandatory sentence of life without parole for conviction for possessing 672
grams of cocaine was constitutional). A conviction of trafficking in cocaine can
properly be subject to a sentence of life without parole. *U.S. v. Scott*, 610 F. 3d
1009, 1018 (8th Cir. 2010) (stating that "[w]e have repeatedly affirmed the
constitutionality of life sentences under 21 U.S.C. § 841(b)(1)(A). *See, e.g.,
United States v. Williams*, 534 F. 3d 980, 986 (8th Cir. 2008); *United States v.
Whiting*, 528 F. 3d 595, 597 (8th Cir. 2008) (per curiam); *United States v.
Whitehead*, 487 F. 3d 1068, 1070-71 (8th Cir. 2007); *United States v. Collins*, 340
F. 3d 672, 679-80 (8th Cir. 2003). 'Possession, use, and distribution of illegal
drugs represent "one of the greatest problems affecting the health and welfare of
our population." ... [The defendant's] crime threatened to cause grave harm to
society.' *Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J.,
concurring in part and concurring in the judgment). Scott's case is not 'the rare
case in which a threshold comparison of the crime committed and the sentence
imposed leads to an inference of gross disproportionality.' *Ewing v. California*,
538 U.S. 11, 30 (2003) (plurality opinion) (quoting *Harmelin*, 501 U.S. at 1005
(Kennedy, J., concurring in part and concurring in the judgment))."). "The impact
of drugs on the health and welfare of society is reflected in studies which
demonstrate that there is a direct nexus between illegal drugs and crimes of

violence, including the majority of homicides, assaults, robberies and weapons offenses. *Harmelin v. Michigan*, U.S. at 1003." *Valona v. U.S.*, 919 F. Supp. 1260, 1271 n. 6 (E.D. Wisconsin 1996).

> Unlike *Wilson*, Hernandez was involved in a drug enterprise transporting fifteen kilograms of cocaine. Valued at $450,000 at a minimum, across state lines. His trafficking conviction was not disproportionate to the mandatory sentence such that it constituted cruel and unusual punishment.

(Doc. 12-1 at 19-24) (alterations incorporated).

Although Hernandez relies on *Harmelin* as the existing Supreme Court precedent to support his sentencing claim, he does not show the Court of Criminal Appeals unreasonably applied *Harmelin* to the facts of his case. First, the state appellate court correctly found the Eighth Amendment does not embody "a general proportionality principle" regarding sentences not involving the death penalty. *Harmelin*, 501 U.S. at 992-994. Instead, the only clearly established law regarding sentence proportionality is that "a gross disproportionality principle is applicable to sentences for terms of years." *Lockyer*, 538 U.S. at 72. Although the precise contours of this principle are unclear, only "exceedingly rare" and "extreme" cases give rise to a constitutional violation. *Id.* at 73; *United States v. Raad*, 406 F.3d 1322, 1323 (11th Cir. 2005) ("The Supreme Court has made it clear that, outside the context of capital punishment, *successful* challenges to the proportionality of sentences are exceedingly rare.") (internal quotation marks omitted). State legislatures therefore have "broad discretion to fashion a sentence that fits within the scope of the principle." *Id.* at 76.

To prevail on this claim, Hernandez must show the Court of Criminal Appeals' decision was contrary to, or involved an unreasonable application of, the Supreme Court's gross

disproportionality principle. For Hernandez to succeed, "[t]he state court's application of clearly established law must be objectively unreasonable." *Lockyer,* 538 U.S. at 75.

Under the § 2254 standard, this court finds that the Court of Criminal Appeals' decision was not contrary to or an unreasonable application of the Supreme Court's gross disproportionality principle. For the state court to conclude that Hernandez's sentence fell short of being an "extraordinary case" clearly violating the Eighth Amendment's prohibition against cruel and unusual punishment was not objectively unreasonable; this conclusion is especially true in light of the broad discretion afforded state legislatures in imposing mandatory sentences under present Supreme Court precedent. Without such a finding, this court must give deference to the decision of the state court, as mandated by § 2254(d)(1).

For the foregoing reasons, Petitioner's sentencing claim is due to be denied.

## III.    CONCLUSION

For all of the foregoing reasons, the undersigned concludes: (1) the claims regarding ineffective assistance of counsel (Claims 5-8) and the sentencing court's jury charge (Claim 3) are due to be **DISMISSED** as unexhausted; and (2) the remaining claims are due to be **DENIED** on the merits.

Additionally, in accordance with Rule 11 of the *Rules Governing 2254 Proceedings,* the court finds that a certificate of appealability is due to be be **DENIED**. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues

presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation omitted). Based on the authority discussed above, the court is of the opinion that a certificate of appealability is not warranted here.

The court will enter a separate Final Order and Judgment.

DONE and ORDERED this 25th day of September, 2018.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE